Eric S. Dwoskin (PHV forthcoming)
**DWOSKIN WASDIN LLP**
433 Plaza Real, Suite 275
Boca Raton, Florida 33432
Tel.: 561-849-8060
edwoskin@dwowas.com

Robert G. Loewy (SBN 179868)
**LAW OFFICES OF ROBERT G. LOEWY, P.C**
20 Enterprise, Suite 310
Aliso Viejo, California 92656
Tel.: 949-468-7150
rloewy@rloewy.com
*Counsel for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEILA BREWER, ALEXIS CAMPBELL, CATHERINE DONAHUE, and EMILY KOHRING, individually and on behalf of all others similarly situated, | Case No.: |
| | CLASS ACTION COMPLAINT |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| vs. | |
| THE PERIOD COMPANY, | |
| Defendants. | |

- 1 -

Sheila Brewer, Alexis Campbell, Catherine Donahue, and Emily Kohring, individually and on behalf of all others similarly situated (collectively, Plaintiffs), bring this Class Action Complaint against The Period Company ("TPC" or "Defendant"), and upon personal knowledge as to Plaintiffs' own conduct, and on information and belief as to all other matters based on an investigation by counsel, alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is a civil class action brought by Plaintiffs, individually and on behalf of all consumers who purchased TPC period underwear ("Period Underwear" or "Products"), which are used for personal hygiene purposes to collect and/or absorb menstrual fluid.

2.    TPC designs, formulates, manufactures, markets, advertises, distributes, and sells Period Underwear to consumers throughout the United States.

3.    TPC's Products are sold on its website, as well as at various online and brick-and-mortar retailers.

4.    Consumers, including Plaintiffs, pay a premium for this personal hygiene product compared to cheaper disposable alternatives such as tampons. This is because consumers, including Plaintiffs, like an easier, safer, and more environmentally sustainable approach to feminine hygiene care as compared to traditional single-use feminine hygiene products.

5.    TPC differentiates itself in the highly competitive menstrual product market by uniformly advertising its Products as "waste-free," "non-toxic," "sustainable," and "kind to the user and to the Planet."[1] Through its uniform, widespread, nationwide advertising campaign, TPC has led consumers to believe that

---

[1]    https://period.co (TPC Period Underwear is "waste-free" and "non-toxic"); https://period.co/pages/our-mission (TPC is "sustainable" and makes Products that are "kind to the user and the Planet"); https://www.amazon.com/Period-Company-Bikini-Style-Super-Absorbent-Underwear/dp/B09356C4FT?ref_=ast_sto_dp&th=1&psc=1 (TPC Period Underwear are "waste-free" and "a sustainable sanitary solution" that will help "save the planet").

1  its Period Underwear is a safe, healthy, and sustainable choice for women and the
2  environment, and that it is free of harmful toxins.

3       6.     One area of particular concern to consumers of period underwear is the
4  presence or absence of harmful chemicals, including per- and polyfluoroalkyl
5  substances ("PFAS").

6       7.     PFAS are a group of over 10,000 synthetic chemicals manufactured by
7  humans and known to be harmful to both the environment and to humans.

8       8.     PFAS are often referred to as "forever chemicals" because they are highly
9  persistent and do not biodegrade or break down naturally in the environment.

10       9.     PFAS chemicals are not environmentally sustainable.

11       10.    PFAS chemicals are toxic to humans.

12       11.    TPC tells consumers that: "PFAS toxins have been linked to cancer,
13  reproductive and immune system harm and other diseases." [2]

14       12.    TPC tells consumers that "We don't know how much PFAS the body
15  absorbs from underwear, but a recent study showed that the absorption of PFAS
16  through the skin is as harmful as when PFAS are ingested orally."[3]

17       13.    In light of the growing consumer concern surrounding PFAS, a key part
18  of TPC's marketing is that its Products are free of any PFAS.

19       14.    TPC states on its website that its Period Underwear is tested and found to
20  be PFAS-free:[4]



^ **Is Period. underwear safe?**

Yes! And thank you for asking because this is a really important conversation.
We're one of the safest ways you can period. We rigorously third party test every
production and reject any materials that don't meet our PFAs-free standard. We
would never ever knowingly use anything that contained PFAs.

[2]  http://help.period.co/en/articles/4368077-what-s-the-deal-with-pul-and-pfas-toxins-is-it-safe  (last
accessed November 6, 2023)
[3]  http://help.period.co/en/articles/4368077-what-s-the-deal-with-pul-and-pfas-toxins-is-it-safe  (last
accessed November 6, 2023)
[4] https://period.co/pages/period-faq (last visited November 8, 2023)

15.    TPC states on its Amazon store that its Period Underwear is tested and found to be PFAS-free and toxin-free:[5]



16.    TPC states in its social media advertising that its Period Underwear is PFAS-free:[6]

17.    TPC sends messages to consumers telling them its Period Underwear is PFAS-free, and then uses those messages as advertisements publicly displayed on TPC's social media platforms:[7]



---

[5] https://www.amazon.com/Period-Company-Bikini-Style-Super-Absorbent-Underwear/dp/B09356C4FT?ref_=ast_sto_dp&th=1&psc=1 (last visited November 8, 2023)

[6] https://www.instagram.com/p/Cvh7NTmJyL4/?img_index=1 (last visited November 8, 2023)

[7] https://www.instagram.com/p/CuCkLF3xyvU/ (last visited November 8, 2023)

CLASS ACTION COMPLAINT

18.    Reasonable consumers, therefore, fairly and reasonably understand that TPC Products are a safe, healthy, and sustainable choice for women and the environment, and that TPC's Period Underwear is PFAS-free.

19.    Consumers, including Plaintiffs and Class Members (defined below), were exposed to and relied upon TPC's marketing with respect to these issues when purchasing TPC's Period Underwear.

20.    TPC's marketing materials are false, deceptive, and misleading.

21.    In reality, independent testing has confirmed the existence of multiple PFAS chemicals in TPC Period Underwear using industry standard testing.   The presence of PFAS chemicals contradicts TPC's pervasive and unvarying representations that its Products are environmentally sustainable, non-toxic, and PFAS-free.

22.    TPC's misrepresentations were, at best, entirely careless.  Upon information and belief: (a) TPC only tests its Period Underwear for less than 1% of the PFAS chemicals known to exist, but nevertheless tells consumers, without qualification, that its Period Underwear is PFAS-free; and (b) TPC does not do adequate testing for the presence of PFAS in its Period Underwear because an industry standard test would demonstrate detectable levels of PFAS in TPC's Products.

23.    Consumers pay a premium for TPC Period Underwear because of TPC's representations that its products are environmentally sustainable, non-toxic, and PFAS-free.

24.    TPC's misrepresentations render TPC Period Underwear worthless or, at a minimum, less valuable. If TPC had disclosed to Plaintiffs and Class Members that TPC Period Underwear in fact contained PFAS—and was not environmentally sustainable, non-toxic, and PFAS-free—Plaintiffs and Class Members would not have purchased TPC Period Underwear, or they would have paid less for TPC Period Underwear.

25.    Accordingly, Plaintiffs and Class Members did not receive the benefit of

1  their bargain and overpaid for TPC Period Underwear.

2      26.    Plaintiffs seek damages and equitable remedies for themselves and for the

3  proposed Classes.

4      **II.    JURISDICTION AND VENUE**

5      27.    This Court has subject-matter jurisdiction over this action pursuant to 28

6  U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005, because:

7  (a) there are at least 100 class members; (b) the matter in controversy exceeds $5

8  million, exclusive of interest and costs; and (c) at least one plaintiff is a citizen of a

9  different state than at least one defendant.

10     28.    This Court has supplemental jurisdiction over Plaintiffs' state law claims

11  pursuant to 28 U.S.C. §1367.

12     29.    This Court has personal jurisdiction over Defendant because its principal

13  place of business is in Los Angeles, California, a substantial part of the acts giving rise

14  to Plaintiffs' claims occurred in Los Angeles, California, and Defendant purposefully

15  availed itself of the laws of the State of California.

16     30.    Venue is proper in this District under 28 U.S.C. §1391 because

17  Defendant's principal place of business in this District, a substantial part of the events

18  or omissions giving rise to the claims at issue occurred in this District and because

19  Defendant is subject to the personal jurisdiction of this Court.

20     **III.    PARTIES**

21     31.    Plaintiff Sheila Brewer is a resident of Richmond Hill, Georgia. As

22  described more fully below, Brewer was exposed to and relied upon TPC's marketing

23  message that TPC Products were environmentally sustainable, non-toxic, and PFAS-

24  free, and purchased TPC Period Underwear during the relevant time period.

25     32.    Plaintiff Alexis Campbell is a resident of Orono, Maine. As described

26  more fully below, Campbell was exposed to and relied upon TPC's marketing message

27  that TPC Products were environmentally sustainable, non-toxic, and PFAS-free, and

28  purchased and used TPC Period Underwear during the relevant time period.

33.     Plaintiff Catherine Donahue is a resident of Los Angeles, California. As described more fully below, Donahue was exposed to and relied upon TPC's marketing message that TPC Products were environmentally sustainable, non-toxic, and PFAS-free, and purchased and used TPC Period Underwear during the relevant time period.

34.     Plaintiff Emily Kohring is a resident of Auburn, Washington. As described more fully below, Kohring was exposed to and relied upon TPC's marketing message that TPC Products were environmentally sustainable, non-toxic, and PFAS-free, and purchased and used TPC Period Underwear during the relevant time period.

35.     Defendant The Period Company is a Delaware corporation with its principal place of business located at 6434 Santa Monica Blvd., Los Angeles, California 90038.

## IV.     GENERAL FACTUAL ALLEGATIONS

36.     Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased TPC Period Underwear. Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from their purchase of TPC Period Underwear, including but not limited to, diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties.

### A.     Environmental and Health Concerns with Feminine Hygiene Products.

37.     Until very recently, commercially available feminine hygiene products in the United States were largely limited to disposable tampons and pads.

38.     Health concerns about feminine hygiene products date back to the 1980s, when tampons were first linked to toxic shock syndrome, a potentially life-threatening condition.[8]

---

[8] *Toxic Shock Syndrome,* Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15437-toxic-shock-syndrome (last accessed Oct. 24, 2023).

39.     Currently, there is significant public health concern about the chemicals used in feminine hygiene products.[9] Potential negative health effects stemming from the chemicals in tampons and pads, in addition to environmental concerns related to single-use plastics, have caused many women to seek out alternative menstrual hygiene products.

40.     Industry research shows that increased demand for alternative menstrual hygiene products has largely been driven by young women in the 18-34-year-old category who cite environmental and health concerns about traditional disposable period products.[10]

41.     According to a study conducted by the sustainability marketing firm Shelton Group, nearly 40% of women aged 18-34 have switched or are considering switching to reusable products to manage their periods.[11]

42.     "Sustainability" generally refers to a concern for how the use of resources will impact the environmental, social, and economic health of future generations.

43.     "Sustainable" products do not adversely impact the environment.

44.     "Sustainable" products do not adversely impact human health.

45.     "Sustainable" products are products that can be manufactured, used, and disposed of without adversely impacting the health of the environment for future generations.

46.     "Sustainable" products do not contain chemicals that are highly persistent and do not biodegrade or naturally break down in the environment.

47.     If a product contains PFAS, it is not "sustainable."

---

[9] *New Tampon Testing Reveals Undisclosed Carcinogens and Reproductive Toxins*, Women's Voices for the Earth, (June 5, 2018), https://womensvoices.org/2018/06/05/new-tampon-testing-reveals-undisclosed-carcinogens-and-reproductive-toxins/

[10] Karen McIntyre, *Feminine Hygiene Manufacturers Shift Focus*, (Nov. 8, 2019), https://www.nonwovens-industry.com/issues/2019-11/view_features/feminine-hygiene-manufacturers-shift-focus/

[11] *Id.*

## B.    PFAS Chemicals

48.    One area of particular concern to consumers of period underwear is the presence or absence of harmful chemicals, including PFAS.  Indeed, the presence of PFAS in period underwear is so material to consumers that TPC dedicates a substantial amount of its marketing resources to promoting its Period Underwear as PFAS-free.

49.    PFAS are a group of over 10,000 synthetic chemicals manufactured by humans.[12]

50.    PFAS are commonly referred to as "forever chemicals," meaning they are highly persistent and do not biodegrade or naturally break down in the environment.[13]

51.    PFAS chemicals are known to be harmful to the environment and to humans.[14]

---

[12] *Nat'l Inst. of Env't Health Sciences, Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Insts. of Health U.S. Dept. of Health and Human Servs. ("NIH"), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited Nov. 9, 2023) ("PFAS are a group of nearly 15,000 synthetic chemicals"); Elsie M. Sunderland, et al., *A review of the pathways of human exposure to poly- and perfluoroalkyl substances (PFASs) and present understanding of health effects*, 29 J. Expo Sci. Environ. Epidemiol, 131-47 (2019), DOI: 10.1038/s41370-018-0094-1 (PFAS "manufactured by humans").

[13] As an illustration of how "forever" PFAS compounds are, in 1997, when a PFAS manufacturer sought "clean blood samples" to compare to PFAS-tainted samples, the only source of "clean blood" (free of PFAS contamination) was the "preserved blood of soldiers who died in the Korean War, before [PFAS] products spread worldwide." *Poisoned Legacy*, Environmental Working Group (May 1, 2015), https://www.ewg.org/research/poisoned-legacy.  *See also* NIH, *supra* at n.11 ("PFAS remain in the environment for an unknown amount of time"); *infra* at n.22 ("All PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and in our bodies").

[14] *Id.*; *See also* Abrahm Lustgarten, et al., *Suppressed Study: The EPA Underestimated Dangers of Widespread Chemicals*, InDepthNH.org (June 201 2018), https://indepthnh.org/2018/06/21/suppressed-study-the-epa-underestimated-dangers-of-widespread-chemicals/; Linda S. Birnbaum, *The Perils of PFAS*, Gillings School of Public Health, UNC, (Feb. 12, 2021), https://sph.unc.edu/wp-content/uploads/sites/112/2019/08/The-Perils-of-PFAS-UNC-Final-2.12.21.pdf; *Toxicological Profile for Perfluoroalkyls*, Agency for Toxic Substances and Disease Registry, https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=1117&tid=237 (last visited Oct. 24, 2023); Nicholas J. Herkert, et. al., "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162 ("PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."); Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Oct. 24, 2023).

52.    On October 18, 2021, underscoring the gravity of the PFAS threat, the Biden-Harris Administration announced "accelerated efforts to protect Americans from per- and polyfluoroalkyl substances (PFAS), which can cause severe health problems and persist in the environment once released, posing a serious threat across rural, suburban, and urban areas."[15]

53.    While there are thousands of PFAS chemicals in existence, they are all categorized as either "long-chain" or "short-chain" based on the amount of carbon atoms they contain. Long-chain PFAS chemicals contain more than 8 carbon atoms, while any PFAS chemicals containing less than 8 carbon atoms are considered short-chain.

54.    Two common types of long-chain PFAS are perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

55.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of research regarding the adverse effects of fluorochemicals. The NTP concluded that both PFOA and PFOS are presumed to be an immune hazard to humans.[16]

56.    The United States Environmental Protection Agency ("EPA") has also recognized the health risks associated with exposure to PFOA and PFOS. In 2016, the EPA established its first health advisory level ("HAL") for combined PFOS and PFOA in drinking water at 70 ppt.[17] In June of 2022, the EPA introduced new interim health advisories which significantly lowered the HAL for PFOS and PFOA. The 2022 HAL

---

[15] FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution, The White House, (Oct. 18, 2021); https://bit.ly/3DZvZba.

[16] *See* U.S. Dep't of Health and Human Servs., Nat'l Toxicology Program, NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate (Sept. 2016), at 1, 17, 19, available at https://ntp.niehsnih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[17] Lifetime Health Advisories and Health Effects Support Documents for Perfluorootanic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101, 33250 (May 25, 2016).

CLASS ACTION COMPLAINT

for PFOA is .004 ppt and for PFOS is .02 ppt.[18] In setting these new interim HALs, the EPA relied on "data and draft analyses that indicate that the levels at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS."[19] On March 14, 2023, the EPA proposed a new National Primary Drinking Water Regulation ("NPDWR") that would set the enforceable maximum containment levels ("MCL") for PFOA and PFOS in drinking water at 4.0 ppt.[20] The EPA proposed setting the nonenforceable MCL goal for PFOA and PFOS at zero because there is no dose of either chemical that is considered safe.[21] However, the MCL was set at 4.0 ppt because that is the lowest reliable detection rate for these chemicals under currently available technology. On September 6, 2022, the EPA also initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[22] In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present substantial danger to public health or welfare or the environment when released into the environment."[23]

57.     Long-chain PFAS chemicals, like PFOA and PFOS, have been phased out of use in the United States and Europe due to their toxicity to humans and the environment.

---

[18] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 118, 36848, 36849 (June 21, 2022).

[19] *Id.*

[20] EPA Fact Sheet, *EPA's Proposal to Limit PFAS in Drinking Water* (Mar. 2023), at 1, available at https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_PFAS_NPWDR_Final_4.4.23.pdf.

[21] Pre-Publication Federal Register Notice: PFAS National Primary Drinking Water Regulation Rulemaking (Mar. 2023), at 2, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

[22] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 171, 54415 (Sept. 6, 2022).

[23] *Id.* at 54417.

CLASS ACTION COMPLAINT

58.    Certain industries have continued to use short-chain PFAS chemicals.

59.    All PFAS, including both long- and short-chain PFAS, contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[24]

60.    Short-chain PFAS chemicals pose similar health and environmental risks as long-chain PFAS chemicals—including bioaccumulation and adverse human health consequences.[25]

61.    The U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as their long-chain counterparts.[26] Their 2019 studies found that both long and short-chain PFAS affected the same organ systems, with the greatest impact seen in the liver and thyroid hormone.[27]

62.    Use of PFAS in the manufacturing of consumer products leads to the accumulation of PFAS in soil, water, and elsewhere in the environment.[28]

63.    PFAS chemicals are also known to migrate during laundering, meaning that clothing items which are tainted with PFAS release those chemicals into waterways when they are washed.[29]

---

[24] *Id.*

[25] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says*, Chemical & Engineering News, August 24, 2019, https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; *Per- and Polyfluoroalkyl Substances (PFAS)*, NATIONAL TOXICOLOGY PROGRAM, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last visited Oct. 24, 2023). *See also* Sunderland, *supra* at n.11 ("Lessons learned from legacy PFASs indicate that limited data should not be used as a justification to delay risk mitigation actions for replacement PFASs").

[26] *Id.*

[27] *Id.*

[28] NIH, https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited Nov. 9, 2023); Francisca Pérez, et al., *Accumulation of Perfluoroalkyl Substances in Human Tissues*, 59 Environ. Int'l 354 (2013).

[29] *Polyfluoroalkyl substances (PFASs) in textiles for children*, Sec. 5.2.4, Ministry of Environment and Food, The Danish Environmental Protection Agency, https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf.

64.    Once PFAS are introduced into the environment they quickly spread around the globe through multiple pathways, as demonstrated in the figure below:[30]



65.    "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[31]

66.    PFAS chemicals are not environmentally sustainable.

67.    PFAS chemicals are not kind to the planet.

68.    When disposed, PFAS chemicals are a type of waste.

69.    PFAS are toxic to humans, even at very low levels.[32]

---

[30] "PFAS Free, What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Oct. 24, 2023).

[31] *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last visited Oct. 24, 2023).

[32] Abrahm Lustgarten, et al., *Suppressed Study: The EPA Underestimated Dangers of Widespread Chemicals*, InDepthNH.org (June 201 2018), https://indepthnh.org/2018/06/21/suppressed-study-

70.    PFAS toxins have been linked to cancer, reproductive and immune system harm and other diseases.[33]

71.    Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[34]

72.    Even very small doses of PFAS have been linked to cancer, reproductive and immune system harm and other diseases.[35]

73.    A figure from the European Environmental Agency shows the "effects of PFAS on human health."[36]



---

the-epa-underestimated-dangers-of-widespread-chemicals/; Linda S. Birnbaum, *The Perils of PFAS*, Gillings School of Public Health, UNC, (Feb. 12, 2021), https://sph.unc.edu/wp-content/uploads/sites/112/2019/08/The-Perils-of-PFAS-UNC-Final-2.12.21.pdf; *Toxicological Profile for Perfluoroalkyls*, Agency for Toxic Substances and Disease Registry, https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=1117&tid=237 (last visited Oct. 24, 2023).

[33]  http://help.period.co/en/articles/4368077-what-s-the-deal-with-pul-and-pfas-toxins-is-it-safe (last accessed November 6, 2023)

[34] Nicholas J. Herkert, et. al., "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162. *See also* Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Oct. 24, 2023).

[35] https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last visited November 7, 2023).

[36] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified May 25, 2023), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.

- 14 -

74.    A 2020 New York Times article discussed the effect of PFAS exposure to pregnant women and babies, explaining the effects of PFAS on metabolism and immunity:

> "[s]cientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.  'And while we understandably focus on highly contaminated communities,' Dr. Lanphear said, 'we can predict, based upon all the other evidence, that ***there's unlikely to be any safe level***.'"

(Emphasis added.)[37]

75.    PFAS chemicals are not kind to human bodies.

76.    Humans can be exposed to PFAS in a variety of ways, including ingestion, inhalation, and skin absorption.[38]

77.    PFAS exposure through the skin causes harm similar to ingestion.[39]

78.    A recent study showed that the absorption of PFAS through the skin is as harmful as when PFAS are ingested orally.[40]

79.    Humans can be exposed to PFAS by using products containing PFAS.[41]

80.    PFAS in period underwear can expose wearers of the underwear to PFAS.

---

[37] Liza Gross, *These Everyday Toxins May Be Hurting Pregnant Women and Their Babies*, The New York Times, (Sept. 23, 2020), https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[38] *Per- and Polyfluoroalkyl Substances (PFAS)*, *supra* at n.22.

[39] https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last visited November 7, 2023).

[40] http://help.period.co/en/articles/4368077-what-s-the-deal-with-pul-and-pfas-toxins-is-it-safe (last accessed November 6, 2023).

[41] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited November 6, 2023).

CLASS ACTION COMPLAINT

81.    TPC does not know how much PFAS the body absorbs from underwear.[42]

**C.    Defendant's Products and Representations.**

82.    TPC, well aware of the demand for reusable, sustainable, and healthy menstrual hygiene products, has become a leader in the alternative menstrual product market.

83.    TPC Period Underwear are washable, reusable period underwear designed to replace pads and tampons.

84.    TPC Period Underwear are reusable, durable goods designed to be repeatedly worn, washed and re-worn on multiple occasions, similar to regular underwear.

85.    TPC markets and advertises its Period Underwear to women across a variety of platforms, including but not limited to, online and social media advertisements.

86.    TPC tells consumers that its Period Underwear are "sustainable," "kind to the user and to the Planet," and help consumers "save the planet."[43]

87.    TPC tells consumers that its Period Underwear are "waste-free."[44]

88.    TPC tells consumers that its Period Underwear are "non-toxic."[45]

89.    Consumers have grown increasingly aware of and concerned about the

---

[42]  http://help.period.co/en/articles/4368077-what-s-the-deal-with-pul-and-pfas-toxins-is-it-safe (last accessed November 6, 2023).

[43]https://www.amazon.com/Period-Company-Bikini-Style-Super-Absorbent-Underwear/dp/B09356C4FT?ref_=ast_sto_dp&th=1&psc=1 ("[O]ur women's underwear are a sustainable sanitary solution … Whether you're looking to take control of your cycle, save the planet, or simply pad your wallet - our super absorbent underwear for women can offer you exactly what you want"); https://period.co/pages/our-mission ("THE PERIOD COMPANY believes in sustainability" and makes products that are "kind to the user and to the Planet.").

[44]    https://period.co ("waste-free") (last visited Nov. 8, 2023); *see also* https://www.amazon.com/Period-Company-Bikini-Style-Super-Absorbent-Underwear/dp/B09356C4FT?ref_=ast_sto_dp&th=1&psc=1 ("Our revolutionary menstrual underwear for teen girls and women are the waste-free, affordable, and extra-absorbent option you've been waiting for.") (last visited Nov. 8, 2023).

[45] https://period.co ("non-toxic") (last visited Nov. 8, 2023).

CLASS ACTION COMPLAINT

1  presence of PFAS in the products they use.[46]

2      90.    In light of the growing consumer concern surrounding PFAS, a key part

3  of TPC's marketing is that its Products are free of any PFAS.

4      91.    TPC states on its website that its Period Underwear is tested and found to

5  be PFAS-free:[47]

6
7      Is Period. underwear safe?

   Yes! And thank you for asking because this is a really important conversation.
   We're one of the safest ways you can period. We rigorously third party test every
7  production and reject any materials that don't meet our PFAs-free standard. We
   would never ever knowingly use anything that contained PFAs.

8

9      92.    TPC states on its Amazon store that its Period Underwear is tested and

10  found to be PFAS-free and toxin-free:[48]

11
   Q: Are Period. Underwear safe?
   A: Period. is one of the safest and best ways to period. Our fabrics have been
12  rigorously tested by a third party company to ensure we are PFAS-free and  tox-
   in-free. We also have a Chief of Medicine who not only endorses Period., she wears
13  them!

14      93.    TPC states in its social media advertising that its Period Underwear is

15  PFAS-free:[49]

16

17

18

19

20

21

22

23

24

25  [46] LastWeekTonight, *PFAS: Last Week Tonight with John Oliver (HBO)*, YouTube (Oct. 4, 2021),
26  https://www.youtube.com/watch?v=9W74aeuqsiU.

   [47] https://period.co/pages/period-faq (last visited November 8, 2023).

27  [48] https://www.amazon.com/Period-Company-Bikini-Style-Super-Absorbent-
28  Underwear/dp/B09356C4FT?ref_=ast_sto_dp&th=1&psc=1 (last visited November 8, 2023).

   [49] https://www.instagram.com/p/Cvh7NTmJyL4/?img_index=1 (last visited November 8, 2023).

CLASS ACTION COMPLAINT

94.    TPC sends messages to consumers telling them its Period Underwear is PFAS-free, and then proudly displays those messages publicly on TPC's social media platforms:[50]



95.    TPC is aware of consumer demand for personal care products that are free from ingredients suspected or known to cause harm to humans and the environment, which is why it has consistently marketed TPC as environmentally friendly and sustainable, non-toxic, and PFAS-free.

96.    The obvious implication of TPC's marketing is to convince consumers that TPC is thoughtful and intentional about delivering Products that are free of chemicals harmful to humans and the environment, including PFAS chemicals.

97.    In light of TPC's uniform, pervasive marketing, reasonable consumers would not expect any amount of PFAS to be included in TPC Period Underwear.

**D.    Laboratory Testing Identified PFAS Chemicals in TPC Period Underwear.**

98.    Contrary to TPC's representations, and a reasonable consumers' expectation of sustainable, non-toxic, and PFAS-free products, TPC Period Underwear contains PFAS chemicals.

---

[50] https://www.instagram.com/p/CuCkLF3xyvU/ (last visited November 8, 2023)

CLASS ACTION COMPLAINT

99.   In September 2023, TPC Period Underwear was tested by an independent, third-party laboratory to determine whether it contained PFAS chemicals.

100.   The method used in the testing is the industry standard for identifying PFAS compounds in consumer products, like TPC Period Underwear.

101.   The independent testing identified multiple PFAS chemicals in TPC Period Underwear.

102.   On information and belief, during the relevant time period, TPC Period Underwear was manufactured similarly and in the same facilities.

103.   On information and belief, the TPC Period Underwear subject to the independent testing was manufactured similarly and in the same facilities as the TPC Period Underwear purchased by Plaintiffs and the Class Members.

**E.   TPC's Pervasive Marketing Campaign Is False and Deceptive.**

104.   The presence of PFAS in TPC Period Underwear is inconsistent with TPC's marketing and advertising, as described above.

105.   Given the presence of PFAS in TPC Period Underwear, TPC's uniform and pervasive marketing is false, deceptive and misleading, including, for example, because TPC Period Underwear is *not* (a) environmentally "sustainable"; (b) "kind to … the Planet": (c) "waste-free"; (d) "non-toxic"; or (d) PFAS-free.

106.   As a result, TPC's uniform and pervasive advertising and marketing of TPC Period Underwear is false and deceptive.

**F.   Economic Injury to Plaintiff and the Classes from the Diminished Value of TPC Period Underwear**

107.   No reasonable consumer would expect that a product line marketed as sustainable, non-toxic, and PFAS-free, would in fact contain PFAS.

108.   No reasonable consumer would have purchased, or paid as much for, TPC Period Underwear had they known the Products contained harmful chemicals linked to environmental harm and adverse health effects in humans.

109.   Plaintiffs and the Classes were injured economically when they purchased

CLASS ACTION COMPLAINT

1    TPC Period Underwear, including because they (a) did not receive the benefit of their

2    bargain, and instead purchased Period Underwear that contained PFAS and was

3    therefore not environmentally friendly and sustainable, non-toxic, and PFAS-free, and

4    (b) paid a higher purchase price than they would have paid had the presence of PFAS

5    been disclosed.

6        110.    As alleged herein, Plaintiffs and the Classes received something worth

7    less than what they paid for and did not receive the benefit of their bargain. They paid

8    for period underwear that was environmentally friendly and sustainable, non-toxic, and

9    PFAS-free, but they received none of these things.

10        111.    Accordingly, Plaintiffs and the Classes were harmed and suffered actual

11    damages, including economic losses.

12    **G.    Plaintiffs' Experiences**

13        112.    Plaintiff Sheila Brewer ("Brewer") is a resident of Richmond Hill,

14    Georgia.   Brewer purchased a pair of TPC Period Underwear from a Walmart in

15    Savannah, Georgia in, to the best of her recollection, May 2023. Brewer was exposed

16    to TPC's advertising prior to purchasing TPC Period Underwear, and, in deciding to

17    purchase the Product, relied on TPC's representations that the Product was

18    environmentally sustainable, non-toxic and PFAS-free.   Brewer was willing to pay the

19    price she paid for TPC's Product because she believed it was environmentally

20    sustainable, non-toxic, and free of PFAS and other harmful chemicals.   Prior to her

21    purchase, TPC never disclosed to Brewer that TPC's Period Underwear contained

22    PFAS chemicals, and was therefore not PFAS-free, non-toxic, and environmentally

23    sustainable.   If Brewer had been aware of the presence of harmful chemicals in TPC's

24    Products, like PFAS, she would not have purchased the Products or would have paid

25    significantly less for the Products. Therefore, she was overcharged for the Products and

26    did not receive the benefit of her bargain.   As a result of TPC's conduct, Brewer has

27    incurred damages, including economic damages.

28        113.    Plaintiff Alexis Campbell ("Campbell") is a citizen of Maine, residing in

1  Orono.  She purchased three pairs of TPC Period Underwear for approximately
2  $30.  Campbell purchased the Products in June 2023 from TPC's online
3  website.  Campbell was exposed to TPC's advertising prior to purchasing TPC Period
4  Underwear, and relied on TPC's representations that the Products were
5  environmentally sustainable, non-toxic and PFAS-free in deciding to purchase the
6  Products.  Indeed, Campbell was willing to pay the price she paid for the Products
7  because she believed TPC Period Underwear was environmentally sustainable, non-
8  toxic, and did not contain PFAS or other harmful chemicals.  Prior to her purchase,
9  TPC never disclosed to Campbell that TPC Period Underwear contained PFAS
10 chemicals, and was therefore not PFAS-free, safe for her and for the environment, and
11 non-toxic.  Prior to her purchase, Plaintiff Campbell was unaware of the presence of
12 harmful chemicals in the Products, like PFAS. If Plaintiff Campbell had been aware of
13 the presence of harmful chemicals in the Products, like PFAS, she would not have
14 purchased the Products or would have paid less for them. Therefore, she was
15 overcharged for the Products and did not receive the benefit of her bargain.  As a result
16 of TPC's conduct, Campbell has incurred damages, including economic damages.

17      114.  Plaintiff Catherine Donahue ("Donahue") is a resident of Los Angeles,
18 California.  Donahue purchased two pairs of TPC Period Underwear in February 2023
19 from TPC's online website for approximately $20.  Donahue was exposed to TPC's
20 advertising prior to purchasing TPC underwear, and, in deciding to purchase the
21 Products, relied on TPC's representations that the product was environmentally
22 sustainable, non-toxic and PFAS-free.  Donahue was willing to pay the price she paid
23 for TPC's Products because she believed they were environmentally sustainable, non-
24 toxic, and free of PFAS and other harmful chemicals.  Prior to her purchase, TPC never
25 disclosed to Donahue that TPC's Period Underwear contained PFAS chemicals, and
26 was therefore not PFAS-free, non-toxic, and environmentally sustainable.  If Donahue
27 had been aware of the presence of harmful chemicals in TPC's Products, like PFAS,
28 she would not have purchased the Products or would have paid significantly less for

the Products. Therefore, she was overcharged for the Products and did not receive the benefit of her bargain.  As a result of TPC's conduct, Donahue has incurred damages, including economic damages.

115.    Plaintiff Emily Kohring ("Kohring") is a resident of Auburn, Washington.  In or about July 2023, Kohring purchased The Period Company ("TPC") period underwear from Federal Way Supercenter in Federal Way, Washington.  Kohring was exposed to TPC's advertising prior to purchasing TPC underwear, and, in deciding to purchase the product, relied on TPC's representations that the product was environmentally sustainable, non-toxic and PFAS-free.  Kohring was willing to pay the price she paid for TPC's product because she believed it was environmentally sustainable, non-toxic, and free of PFAS and other harmful chemicals.  Prior to her purchase, TPC never disclosed to Kohring that TPC's period underwear contained PFAS chemicals, and was therefore not PFAS-free, non-toxic, and environmentally sustainable.  If Kohring had been aware of the presence of harmful chemicals in TPC's products, like PFAS, she would not have purchased the products or would have paid significantly less for the products. Therefore, she was overcharged for the products and did not receive the benefit of her bargain.  As a result of TPC's conduct, Kohring has incurred damages, including economic damages.

**H.    Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiffs and Reasonable Consumers.**

116.    At all times relevant to this action, Defendant knew, or at minimum should have known, that TPC Period Underwear contains PFAS.

117.    TPC's misrepresentations and omissions appear to be intentional or otherwise entirely careless.

118.    Upon information and belief, TPC only tests its Period Underwear for less than 1% of the over 10,000 PFAS chemicals known to exist.

119.    TPC does not do adequate testing for the presence of PFAS in its Period

1    Underwear because an industry standard test would demonstrate detectable levels of
2    PFAS in TPC's Products.

3        120.    On information and belief, a scientist at Duke University warned TPC that
4    "you can't claim that your products contain zero PFAS," including because "[t]here are
5    over 10,000" PFAS compounds in existence and TPC "only tests for 30 compounds."[51]
6    In other words, TPC was on notice that it had only tested its Period Underwear for less
7    than 1% of the PFAS chemicals in existence, but it nevertheless told consumers,
8    without qualification, that its Period Underwear were PFAS-free.  And TPC continues
9    to market its Products as PFAS-free to this day.

10        121.    At minimum, Defendant should have discovered the presence of PFAS in
11    the course of its manufacturing process based on Defendant's purported commitment
12    to the sustainability and non-toxicity of the Products, as alleged herein.

13        122.    Defendant has engaged in deceptive, untrue, and misleading advertising
14    by making representations regarding the sustainability and non-toxic nature of the
15    Products.

16        123.    Defendant made assurances regarding the sustainability and non-toxicity
17    of its Products without disclosing to consumers that the Products contain PFAS
18    chemicals.

19        124.    Additionally, although TPC Period Underwear was found to contain
20    PFAS, nothing in the Products' advertising otherwise insinuates, states, or warns that
21    the Products contain PFAS. Again, such misrepresentations and omissions mislead
22    consumers regarding the sustainability and non-toxicity of the Product.

23

24

---

25    [51] https://www.instagram.com/p/CuCkLF3xyvU/ (user "hannah_metzger" commenting on TPC's
26    PFAS-free marketing stating "There are over 10,000 [PFAS chemicals] discovered to date, the
      overwhelming majority of which cannot be tested for with current technology. So no, you can't claim
      that your products contain zero PFAS. In fact, your third-party biotech company Intertek only tests
27    for 30 compounds…"); *see also* https://globalhealth.duke.edu/student-showcases/epigenetic-
      implications-chronic-pfoa-exposure-shanghai-birth-cohort-study (the same individual publishing a
28    poster regarding a PFAS exposure study in connection with the Duke University Global Health
      Institute).

125.   Rather, to capitalize on increasing consumer demand for sustainable and non-toxic menstrual products which are free from harmful chemicals like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Products from competing options in the highly competitive menstrual product industry by representing TPC as a sustainable and non-toxic brand and TPC Period Underwear as a sustainable and non-toxic product.

126.   Throughout the class period, Defendant has targeted environmentally- and health-conscious consumers by falsely and misleadingly representing that the Products are sustainable and non-toxic. Consequently, reasonable consumers believe the Products are free of chemicals which are known or suspected to harm the environment and human health.

127.   Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell menstrual products which are sustainable and non-toxic, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Products.

128.   Consumers lack the expertise to ascertain the true composition of the Products prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to advertise their products accurately and honestly and not contradict those representations by using harmful chemicals in the Products that are known or suspected to the environment and human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

129.   Defendant's representations that the Products are a sustainable, healthy and non-toxic product, including, inter alia, the representations described herein, are false because products containing toxic chemicals like PFAS are not sustainable or healthy and are toxic.

130.   Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Products would conform with its representations and, as such, would not contain harmful PFAS

1    chemicals.

2    131.    If Defendant had disclosed to Plaintiffs and putative Class Members that

3    its Products contained PFAS chemicals and were therefore not sustainable, not healthy

4    for our bodies and the environment, and not PFAS-free, Plaintiffs and putative Class

5    Members would not have purchased the Products or they would have paid less for them.

6    132.    Plaintiffs and Class Members were among the intended recipients of

7    Defendant's deceptive representations and omissions described herein.

8    133.    Defendant's representations and omissions, as described herein, are

9    material in that a reasonable person would attach importance to such information and

10    would be induced to act upon such information in making purchase decisions.

11    134.    The materiality of the representations described herein also establishes

12    causation between Defendant's conduct and the injuries Plaintiffs and the Class

13    Members sustained.

14    135.    Defendant is aware that consumers are concerned about the use of PFAS

15    in period underwear, yet it has continued to market and advertise its Products as

16    sustainable and healthy, and free of harmful chemicals like PFAS, in order to profit off

17    of unsuspecting consumers, including Plaintiffs and Class Members.

18    136.    The presence of PFAS chemicals in the Products is entirely inconsistent

19    with Defendant's uniform representations.

20    137.    If Defendant had adequately tested the Products for PFAS and other

21    harmful chemicals as it claims, it would have discovered that the Products contain

22    PFAS.

23    138.    Defendant's knowingly false and misleading representations have the

24    intended result of convincing reasonable consumers that its Products are sustainable

25    and non-toxic and therefore do not contain toxic chemicals. No reasonable consumer

26    would consider Defendant's Products sustainable and non-toxic if they knew that the

27    Products contained PFAS chemicals.

28    139.    Defendant's false, misleading, and deceptive representations, as described

- 25 -

1  herein, are likely to continue to deceive and mislead reasonable consumers and the

2  general public. Indeed, they have already deceived and misled Plaintiffs and Class

3  Members.

4      140.   In making the false, misleading, and deceptive representations, Defendant

5  knew and intended consumers would pay a premium for the Products over comparable

6  products that are not marketed as sustainable and non-toxic.

7      141.   When Plaintiffs purchased the Products, Plaintiffs did not know, and had

8  no reasonable means of discovering, that TPC Period Underwear contained harmful

9  PFAS chemicals.

10     142.   Plaintiffs and Class Members all paid money for the Products, however,

11  they did not obtain the full value of the advertised Product due to Defendant's

12  misrepresentations and omissions as detailed herein. Plaintiffs and Class Members

13  purchased, purchased more of, or paid more for, the Products than they would have had

14  they known the truth that TPC Period Underwear contained harmful chemicals. Thus,

15  Plaintiffs and Class Members have suffered injury in fact and lost money or property

16  as a result of Defendant's wrongful conduct.

17     143.   If Defendant had disclosed to Plaintiffs and Class Members that the

18  Products contained PFAS and thus risked consumer exposure to PFAS, Plaintiffs and

19  putative Class Members would not have purchased the Products or they would have

20  paid less for it.

21  **V.    TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

22     144.   Defendant made, and continues to make, affirmative misrepresentations

23  to consumers that the Products contain no PFAS or other harmful chemicals.

24     145.   Defendant concealed material facts that would have been important to

25  Plaintiffs and Class Members in deciding whether to purchase the Products.

26     146.   Defendant was on notice that the testing it relied on in support of its PFAS-

27  free representations only capable of detecting a tiny fraction of the total number of

28  PFAS chemicals in existence.

147.   Defendant did not disclose that the testing it relied on in support of those statements was limited and not capable of determining whether or not the Products were in fact PFAS-free.

148.   Defendant did not disclose to consumers that the Products in fact contain PFAS.

149.   Defendant's concealment deceived reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

150.   The PFAS in TPC Products was not reasonably detectible to Plaintiffs and Class Members.  Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

151.   As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiffs and Class Members of the PFAS, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI.    PRE-SUIT NOTICE

152.   On November 9, 2023 prior to the filing of this Complaint, Plaintiff Donahue and California Class Members and Plaintiff Campbell and Maine Class Members put Defendant on written notice of their claims arising from violations of numerous provisions of California and Maine law, including the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1770, *et seq*., and ME. REV. STAT. tit. 5, §213(1-A), as well as other causes of action. Defendant has not responded.

153.   Plaintiffs' and the other Class members' claims against Defendant under the CLRA and ME. REV. STAT. tit. 5, §213(1-A) right now are for injunctive relief only. If Defendant fails to correct or agree to correct the actions described in the notice letter, Plaintiffs will amend this Complaint to include all compensatory and monetary damages against them to which Plaintiffs and the other Class members are entitled.

## VII.    CLASS ALLEGATIONS

154.    The Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of five proposed classes defined as follows:

**Nationwide Class:** During the fullest period allowed by law, all persons residing in the United States who purchased the Products.

**California Class**: During the fullest period allowed by law, all persons residing in California who purchased the Products.

**Georgia Class**: During the fullest period allowed by law, all persons residing in Georgia who purchased the Products.

**Maine Class**: During the fullest period allowed by law, all persons residing in Maine who purchased the Products.

**Washington Class**: During the fullest period allowed by law, all persons residing in Washington who purchased the Products.

155.    A nationwide class is properly certified in California because TPC is headquartered in California and the majority of the conduct and facts that form the basis for Plaintiffs' claims took place in and/or emanated from California.

156.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

157.    Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional menstrual products manufactured by Defendant with PFAS.

158.    <u>Numerosity</u>: Class Members are so numerous that joinder of all Members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of tens of thousands of people geographically disbursed throughout the United States. The number of Class Members can be determined by sales information

and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. Class Members are readily identifiable from information and records in the possession of Defendant and its authorized distributors and retailers.

159.  Typicality: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased the Products that was formulated, manufactured, marketed, advertised, distributed, and sold by Defendant. Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the Products that was manufactured with harmful chemicals, which makes the Products not what reasonable consumers were intending to purchase. Furthermore, the factual basis of Defendant's misconduct is common to all Class Members because it engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

160.  Commonality: Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members because Defendant acted on grounds generally applicable to all Class Members. Such common legal or factual questions include, *inter alia*:

a) Whether the Products contain PFAS;

b) Whether Defendant's practices in marketing the Products tends to mislead reasonable consumers into believing that the Products are environmentally friendly and sustainable;

c) Whether the Products are, in fact, environmentally friendly and sustainable given that they contain PFAS;

d) Whether Defendant's practices in marketing the Products tends to mislead reasonable consumers into believing that the Products are non-toxic and free of harmful chemicals;

CLASS ACTION COMPLAINT

e) Whether the Products are, in fact, non-toxic and free of harmful chemicals given that they contain PFAS;

f) Whether Defendant's practices in marketing the Products tends to mislead reasonable consumers into believing that the Products are PFAS-free;

g) Whether the Products are, in fact, PFAS-free given that they contain PFAS;

h) Whether Defendant omitted or failed to disclose material information to Plaintiffs and Class Members regarding the Products;

i) Whether Defendant concealed from and/or failed to disclose to Plaintiffs and Class Members that the testing Defendant relied on as a basis for its marketing representations was incapable of determining whether the Products were, in fact, PFAS-free;

j) Whether Defendant concealed from and/or failed to disclose to Plaintiffs and Class Members that harmful chemicals are used in its Products;

k) Whether Defendant breached the implied warranty of merchantability relating to the Products;

l) Whether Defendant breached express warranties relating to the Products;

m) Whether Defendant was negligent in its failure to adequately test the Products;

n) Whether Defendant made negligent misrepresentations about the Products;

o) Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Products;

CLASS ACTION COMPLAINT

p) Whether Defendant engaged in false or misleading advertising by selling and/or marketing the Products containing harmful chemicals;

q) Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

r) Whether Plaintiffs and Class Members either paid a premium for the Products that they would not have paid but for the false marketing of the Products or would not have purchased them at all;

s) Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

t) Whether Plaintiffs and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

161. <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product PFAS class actions, and Plaintiffs intend to prosecute this action vigorously.

162. <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to, or allow its resellers to, advertise, market, promote, and sell the Product in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.

163.   Plaintiffs have standing to make this claim because they may purchase another Products provided that did not contain the PFAS. Defendant has acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

164.   If Defendant is allowed to continue the practices of manufacturing, marketing and selling the Products with the PFAS, and failing to disclose the PFAS to consumers, unless injunctive or declaratory relief is granted, Plaintiffs and the Classes will not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged herein.

165.   Plaintiffs further seek injunctive and declaratory relief requiring Defendant to cease its unfair, deceptive and unlawful conduct, including the following:

      a) Undertake an immediate public information campaign to inform consumers the truth about the PFAS, including at the time of sale of the Products;

      b) Adequately disclose the PFAS to consumers at the time of sale of the Products; and

      c) Remove the PFAS.

166.   Plaintiffs also seeks a declaration that the Products contains PFAS, which existed at the time of sale of the Products to consumers, which was known to Defendant and unknown to consumers.

167.   Plaintiffs and Class Members have been harmed and will experience irreparable future harm should Defendant's conduct not be enjoined because they will be unable to properly replace their Products with sustainable and non-toxic replacement Products, and will have to bear the costs associated with the PFAS if Defendant continues to fail and refuse to provide adequate remuneration to consumers as a result of the PFAS, which exists at the time of sale of the Products.

168.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members all suffered

and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of their individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

169.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

170.    Defendant acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes appropriate.

## VIII.    CAUSES OF ACTION

### CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS

### <u>Nationwide Count 1: Breach of Implied Warranty</u>

### (On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State classes)

171.    Plaintiffs bring this count on behalf of themselves and the Nationwide Class, or in the alternative, state classes, and repeat and re-allege all previous paragraphs, as if fully included herein.

172.    Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

173.    The Products are goods within the relevant laws and Defendant knew or

1  had reason to know of the specific use for which the Products, as goods, were
2  purchased.

3      174.   The implied warranty of merchantability included with the sale of each
4  Products product means that Defendant warranted that the Products would be fit for the
5  ordinary purposes for which the Products were used and sold, and were not otherwise
6  injurious to consumers, that the Products would pass without objection in the trade, be
7  of fair and average quality, and conform to the promises and affirmations of fact made
8  by Defendant. This implied warranty of merchantability is part of the basis for the
9  benefit of the bargain between Defendant, and Plaintiffs, and Class Members.

10      175.   Defendant breached the implied warranty of merchantability because the
11  Products are not fit for their ordinary purpose of providing reasonably environmentally
12  sustainable, non-toxic, and PFAS-free menstrual products for consumers, *inter alia*,
13  the Products contain harmful chemicals which cannot reasonably be characterized as
14  environmentally sustainable, non-toxic, and PFAS-free.

15      176.   The aforementioned problems associated with the Products constitute
16  non-sustainable and toxic non-PFAS-free menstrual products, and therefore, there is a
17  breach of the implied warranty of merchantability.

18      177.   Defendant's warranty expressly applies to the original purchaser and any
19  succeeding owner of the Products, creating privity between Defendant on the one hand,
20  and Plaintiffs and Class Members on the other.

21      178.   Nonetheless, privity is not required because Plaintiffs and Class Members
22  are the intended beneficiaries of Defendant's warranties and its sale through retailers.
23  Defendant's retailers were not intended to be the ultimate consumers of the Products
24  and have no rights under the warranty agreements. Defendant's warranties were
25  designed for and intended to benefit the consumer only and Plaintiffs and Class
26  Members were their intended beneficiaries.

27      179.   More specifically, Defendant's intention that its warranties apply to
28  Plaintiffs and Class Members as third-party beneficiaries is evident from the statements

contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the Products and warranties.

180. Defendant impliedly warranted that the Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by Defendant were environmentally sustainable, non-toxic, and/or PFAS-free; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

181. Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with environmentally sustainable, non-toxic, and PFAS-free menstrual products. Instead, the Products suffered, and continues to suffer, from a formulation, design and/or manufacture containing PFAS, as alleged herein.

182. Defendant's failure to adequately replace the harmful Products caused the warranty to fail in its essential purpose.

183. Defendant breached the implied warranties because the Products were sold with the PFAS, which substantially reduced and/or prevented the Products from being environmentally sustainable, non-toxic, and PFAS-free.

184. As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**Nationwide Count 2: Breach of Express Warranty**

**(On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State classes)**

185. Plaintiffs bring this count on behalf of themselves and the Nationwide Class, or in the alternative, state classes, and repeat and re-allege all previous

1    paragraphs, as if fully included herein.

2        186.   Plaintiffs and Class Members purchased the Products either directly from

3    Defendant or through retailers.

4        187.   Defendant is and was at all relevant times a "merchant" under U.C.C. § 2-

5    313, and related State U.C.C. provisions.

6        188.   In connection with its sale of the Products, Defendant, as the designer,

7    manufacturer, marketer, distributor, or seller, expressly warranted that the Products

8    were free from harmful chemicals, as alleged herein.

9        189.   Defendant's warranty representations consist of the pervasive marketing

10   campaign, including the representations described herein that are made online.

11       190.   The express written warranties covering the Products were a material part

12   of the bargain between Defendant and consumers. At the time it made these express

13   warranties, Defendant knew reasonable consumers were purchasing the Products

14   because they believed it to be as marketed.

15       191.   Each of the Products have an identical or substantially identical product

16   representation(s) as they each are marketed as environmentally sustainable, non-toxic,

17   and PFAS-free.

18       192.   Defendant breached its express warranties by selling the Products that

19   were, in actuality, not free harmful chemicals like PFAS, as promised in the marketing.

20   Defendant breached the warranty because it sold the Products with PFAS, which was

21   known to Defendant and unknown to consumers at the time of sale. Defendant further

22   breached the warranty because it improperly and unlawfully denies valid warranty

23   claims, and it has failed or refused to adequately replace the Products with units that

24   are actually as represented.

25       193.   Defendant breached its express warranty to adequately replace the

26   Products despite its knowledge of the PFAS, and/or despite its knowledge of alternative

27   formulations, designs, materials, and/or options for manufacturing the Products.

28       194.   Defendant further breached its express written warranties to Plaintiffs and

Class Members in that the Products contain harmful chemicals at the time they leave the manufacturing plant, and on the first day of purchase, and by failing to disclose and actively concealing this risk from consumers.

195. The Products that Plaintiffs and Class Members purchased contained a PFAS chemical that is neither environmentally sustainable, non-toxic, nor PFAS-free that resulted in the loss of the product, loss of use of the product, and loss of the benefit of their bargain. Defendant's warranty expressly applies to the original purchaser of the Products for products purchased within the USA, creating privity between Defendant on the one hand, and Plaintiffs and Class Members on the other.

196. Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the Products and warranties, creating privity or an exception to any privity requirement. Plaintiffs and each of the Class Members are the intended beneficiaries of Defendant's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the Products.

197. Defendant has been provided sufficient notice of its breaches of the express warranties associated with the Products.

198. Upon information and belief, Defendant received further notice and has been on notice of its breach of warranties through its sale of Products and of its breaches of warranties through consumer complaints at various sources and its own internal and external testing.

199. As a direct and proximate result of Defendant's breach of its express written warranties, Plaintiffs and Class Members suffered damages and did not receive the benefit of the bargain and are entitled to recover compensatory damages, including, but not limited to, the diminution in value. Plaintiffs and Class Members suffered damages at the point-of-sale stemming from their overpayment for the Products, in

1    addition to loss of the product and its intended benefits.

2    **Nationwide Count 3: Negligent Misrepresentation**

3    **(On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the**

4    **State classes)**

5    200.   Plaintiffs bring this count on behalf of themselves and the Nationwide

6    Class, or in the alternative, state classes, and repeat and re-allege all previous

7    paragraphs, as if fully included herein.

8    201.   Pursuant to California law, Plaintiffs must prove the following for a

9    negligent misrepresentation claim: (1) a misrepresentation of a past or existing material

10    fact, (2) made without reasonable ground for believing it to be true, (3) made with the

11    intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance

12    on the misrepresentation, and (5) resulting damage.

13    202.   As a seller of the Products and a merchant, Defendant had a duty to give

14    correct information to Plaintiffs and Class Members regarding the truth and accuracy

15    of the chemicals in the Products. Defendant had sole possession and control of this

16    information and had a duty to disclose it accurately to Plaintiffs and Class Members.

17    203.   Defendant represented that the Products was environmentally sustainable,

18    non-toxic, and PFAS-free, when in reality, testing has shown that it contained harmful

19    chemicals. Defendant knew, or should have known, that the Products contained non-

20    sustainable and harmful chemicals.

21    204.   Defendant   supplied   the   information   that   the   Products   was

22    environmentally sustainable, non-toxic, and PFAS-free was known by Defendant to be

23    desired by Plaintiffs and Class Members to induce them to purchase the Products.

24    Defendant knew that making these representations would induce customers to purchase

25    its menstrual products over the menstrual products of competitors.

26    205.   Plaintiffs and Class Members relied upon the Defendant's representations

27    that the Products was environmentally sustainable, non-toxic, and PFAS-free when

28    purchasing the Products. Further, this reliance was in fact to their detriment because

the Plaintiffs and Class Members purchased the Products with harmful chemicals.

206.   Plaintiffs and Class Members are entitled to all relief the Court proper as a result of Defendant's actions described herein.

207.   Plaintiffs and Class Members would not have purchased the TPC Underwear if the true facts had been known or would have paid less for them.

208.   The negligent actions of Defendant caused damage to Plaintiffs and Class Members, who are entitled to damages and other legal and equitable relief as a result.

## Nationwide Count 4: Unjust Enrichment

### (On Behalf of Plaintiffs and the Nationwide Class and, in the Alternative, the State classes)

209.   Plaintiffs bring this count on behalf of themselves and the Nationwide Class, or in the alternative, state classes, and repeat and re-allege all previous paragraphs, as if fully included herein.

210.    Plaintiffs and Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for TPC Underwear listed online is $9.00 or more.

211.   By its wrongful acts and omissions described herein, including selling the TPC Underwear with harmful chemicals, Defendant was unjustly enriched at the expense of Plaintiffs and Class Members.

212.   Plaintiffs and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged herein.

213.   Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and Class Members under circumstances in which it would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the TPC Underwear.

214.   Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have

1   purchased TPC Underwear on the same terms or for the same price had they known
2   that the TPC Underwear contained harmful chemicals.

3        215.   Defendant either knew or should have known that payments rendered by
4   Plaintiffs and Class Members were given and received with the expectation that the
5   TPC Underwear were free of harmful chemicals and capable of providing the benefits
6   represented by Defendant in the labeling, marketing, and advertising of TPC
7   Underwear. It is inequitable for Defendant to retain the benefit of payments under these
8   circumstances.

9        216.   When required, Plaintiffs and Class Members are in privity with
10  Defendant because Defendant's sale of TPC Underwear was either direct or through
11  authorized third-party retailers and resellers. Purchase through authorized retailer and
12  resellers is sufficient to create such privity because such authorized third parties are
13  Defendant's agents for the purpose of the sale of TPC Underwear.

14       217.   Likewise, it was reasonably foreseeable that Plaintiffs and Class Members
15  would be the intended beneficiaries of the Products and warranties, creating privity or
16  an exception to any privity requirement. Plaintiffs and each of the Class Members are
17  the intended beneficiaries of Defendant's warranties and its sale through retailers. The
18  retailers were not intended to be the ultimate consumers of the Products and have no
19  rights under the warranty agreements provided by Defendant. Defendant's warranties
20  were designed for and intended to benefit the consumer only and Plaintiffs and Class
21  Members were the intended beneficiaries of the Products.

22       218.   As a direct and proximate result of Defendant's wrongful conduct and
23  unjust enrichment, Plaintiffs and Class Members are entitled to restitution of,
24  disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and
25  other compensation obtained by Defendant for its inequitable and unlawful conduct.

26  **CLAIMS ASSERTED ON BEHALF OF STATE CONSUMER CLASSES**

27  **California Count 1: Violation of the California Consumer Legal Remedies**
28  **Act ("CLRA"), California Civil Code §§ 1750, *et seq.***

**(On Behalf of Plaintiff Catherine Donahue and the California Class)**

219.   Plaintiff Donahue brings this count on behalf of herself and the California Class, and repeats and re-alleges all previous paragraphs, as if fully included herein.

220.   The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq*.

221.   The CLRA applies to all claims of Plaintiff Donahue and California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

222.   Plaintiff Donahue and California Class Members are "consumers" as defined by Civil Code § 1761(d).

223.   Defendant is a "person" as defined by California Civil Code § 1761(c).

224.   The TPC Underwear qualifies as a "good" as defined by California Civil Code § 1761(a).

225.   Plaintiff Donahue's and the California Class Members' purchases of the TPC Underwear are "transactions" as defined by California Civil Code § 1761(e).

226.   As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer unlawful:

        a) "Representing that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ." Civil Code § 1770(a)(5); and

        b) "Representing that goods . . . are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

227.   Defendant engaged in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when it

represented, through its advertising and other express representations, that the TPC Underwear had benefits, characteristics, ingredients, quantities, or qualities that it did not actually have or when they were of another.

228.    As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the TPC Underwear's benefits or characteristics that it did not in fact have, and has represented the TPC Underwear to be of a quality that it was not. Indeed, Defendant concealed this information from Plaintiff Donahue and California Class Members.

229.    The TPC Underwear was not and is not environmentally sustainable, non-toxic, and PFAS-free. As detailed above, Defendant violated the CLRA when it falsely represented that the TPC Underwear meets a certain standard, grade, or quality.

230.    Defendant further violated the CLRA when it advertised the TPC Underwear with the intent not to sell it as advertised, and knew that the TPC Underwear was not as represented.

231.    Specifically, Defendant marketed and represented the TPC Underwear, *inter alia*, as being "waste-free," "non-toxic," "sustainable," and "kind to the user and to the Planet" when in fact the TPC Underwear contains PFAS chemicals known to be harmful to humans.

232.    Defendant's deceptive practices were specifically designed to induce Plaintiff Donahue and California Class Members to purchase or otherwise acquire the TPC Underwear.

233.    Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the TPC Underwear manufactured by Defendant. Defendant's packaging, advertising, marketing, and website contain numerous false and misleading statements regarding the quality and chemicals within the TPC Underwear. These include, *inter alia*, the following misrepresentations contained in its advertising,

1  marketing, social media platforms, and website: "waste-free," "non-toxic,"
2  "sustainable," and "kind to the user and to the Planet."

3      234.   Despite these representations, Defendant omitted and concealed
4  information and material facts from Plaintiff Donahue and California Class Members.

5      235.   In their purchase of the TPC Underwear, Plaintiff Donahue and California
6  Class Members relied on Defendant's representations and omissions of material facts.

7      236.   These business practices are misleading and/or likely to mislead
8  consumers and should be enjoined.

9      237.   On November 10, 2023, Plaintiff Donahue provided written notice to
10  Defendant via certified mail through the United States Postal Service demanding
11  corrective actions pursuant to the CLRA, but Defendant failed to take any corrective
12  action.

13      238.   In accordance with California Civil Code § 1780(a), Plaintiff Donahue
14  and the California Class Members seek injunctive and equitable relief for Defendant's
15  violations of the CLRA, including an injunction to enjoin Defendant from continuing
16  its deceptive advertising and sales practices.

17      239.   Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff
18  Donahue and California Class Members seek an order enjoining Defendant from the
19  unlawful practices described above, a declaration that Defendant's conduct violates the
20  Consumer Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any
21  other relief the Court deems proper under the CLRA.

22  **California Count 2: Violations of the California Unfair Competition Law**
23  **("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
24  **(On Behalf of Plaintiff Donahue and the California Class)**

25      240.   Plaintiff Donahue brings this count on behalf of herself and the California
26  Class, and repeats and re-alleges all previous paragraphs, as if fully included herein.

27      241.   Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

28      242.   Plaintiff Donahue and California Class Members, who purchased the

Defendant's TPC Underwear, suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted the TPC Underwear's true quality and ingredients. Had Plaintiff Donahue and California Class Members known that Defendant materially misrepresented the TPC Underwear and/or omitted material information regarding its TPC Underwear and its ingredients, they would not have purchased the TPC Underwear or would have paid less for the product.

243. Defendant's conduct, as alleged herein, violates the laws and public policies of the state of California and the federal government, as set out in the preceding paragraphs of this complaint.

244. There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its TPC Underwear.

245. Plaintiff Donahue and California Class Members who purchased Defendant's TPC Underwear had no way of reasonably knowing that the TPC Underwear was deceptively packaged, marketed, advertised, and labeled; was not environmentally sustainable, non-toxic, and PFAS-free; and was unsuitable for its intended use. Thus, Plaintiff Donahue and California Class Members could not have reasonably avoided the harm they suffered.

246. Specifically, Defendant marketed, labeled, and represented the TPC Underwear as being environmentally sustainable, non-toxic, and PFAS-free when in fact the TPC Underwear contains harmful PFAS chemicals.

247. The gravity of harm suffered by Plaintiff Donahue and California Class Members who purchased the TPC Underwear outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and/or labeling the TPC Underwear in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous, and offend the established public policies of the state of California and the federal government. Defendant's actions are substantially injurious to Plaintiff Donahue and California Class Members.

248. The above acts of Defendant in disseminating said misleading and

deceptive statements to consumers throughout the state of California, including to Plaintiff Donahue and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's TPC Underwear, and thus were violations of Cal. Bus. & Prof. Code §§ 17200, *et seq*.

249.    As a result of Defendant's unlawful, unfair and fraudulent acts and practices, Plaintiff Donahue, on behalf of herself and the California Class, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

**California Count 3: Violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.**

**(On Behalf of Plaintiff Donahue and the California Class)**

250.    Plaintiff Donahue brings this count on behalf of herself and the California Class, and repeats and re-alleges all previous paragraphs, as if fully included herein

251.    The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

252.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

253.    It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

254.    Defendant, when it marketed, advertised, and sold the TPC Underwear, represented to Plaintiff Donahue and California Class Members that it was

1   environmentally sustainable, non-toxic, and PFAS-free despite the fact that it contains
2   harmful PFAS chemicals.

3       255.   At the time of its misrepresentations, Defendant was either aware that the
4   TPC Underwear contained PFAS chemicals and was not environmentally sustainable,
5   non-toxic, and PFAS-free, or it was aware that it lacked the information and/or
6   knowledge required to make such a representation truthfully.

7       256.   Defendant concealed, omitted, or otherwise failed to disclose this
8   information to Plaintiff Donahue and California Class Members.

9       257.   Defendant's descriptions of the TPC Underwear were false, misleading,
10  and likely to deceive Plaintiff Donahue and other reasonable consumers.

11      258.   Defendant's conduct therefore constitutes deceptive or misleading
12  advertising under the FAL.

13      259.   Plaintiff Donahue has standing to pursue claims under the FAL as she
14  reviewed and relied on Defendant's packaging, advertising, representations, and
15  marketing materials regarding the TPC Underwear when selecting and purchasing the
16  TPC Underwear.

17      260.   In reliance on the statements made in Defendant's advertising and
18  marketing materials, and Defendant's omissions and concealment of material facts
19  regarding the quality and use of the TPC Underwear, Plaintiff Donahue and the
20  California Class Members purchased the TPC Underwear.

21      261.   Had Defendant disclosed the true nature of the TPC Underwear,
22  specifically, the presence of PFAS chemicals therein, Plaintiff Donahue and California
23  Class Members would not have purchased the TPC Underwear or would have paid less
24  for it.

25      262.   As a direct and proximate result of Defendant's actions, as set forth herein,
26  Defendant has received ill-gotten gains and/or profits, including but not limited to,
27  money from Plaintiff Donahue and California Class Members who paid for the TPC
28  Underwear containing PFAS chemicals.

CLASS ACTION COMPLAINT

263.    Plaintiff Donahue and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant by means of its deceptive or misleading representations, including monies already obtained from Plaintiff Donahue and California Class Members as provided for by the Cal. Bus. & Prof. Code § 17500.

### California Count 4: Violations of the Song-Berkeley Act (Civ. Code §§1790, *et seq*.) via Breach of Implied Warranty

**(On Behalf of Plaintiff Catherine Donahue and the California Class)**

264.    Plaintiff Donahue brings this count on behalf of herself and the California Class, and repeats and re-alleges all previous paragraphs, as if fully included herein.

265.    Cal. Civ. Code §1792 provides that, unless properly disclaimed, every sale of consumer goods is accompanied by an implied warranty of merchantability. TPC did not at any time properly disclaim the warranty.

266.    The Period Underwear are "consumer goods" under Cal. Civ. Code §1791(a).

267.    Plaintiff and the other Class members are "buyers" under Cal. Civ. Code §1791(b).

268.    TPC is the "manufacturer" and "seller" of the Period Underwear under Cal. Civ. Code §§1791(j) and (l).

269.    TPC knew of the particular purposes for which the Period Underwear were intended and impliedly warranted to Plaintiffs and the other Class members that the Underwear was "merchantable" under Cal. Civ. Code §§1791.1(a) and 1792.

270.    The Period Underwear is not merchantable, and as such TPC breached their implied warranties, because:

a) The Period Underwear would not pass without objection in the period underwear market because it contains PFAS;

b) The PFAS renders the period underwear unsafe to wear and unfit for ordinary purposes;

c)   The Period Underwear was inadequately labeled as safe and reliable, and the labeling failed to disclose the presence of PFAS; and

d)   The Period Underwear does not conform to their labeling, which represents that the Underwear is safe and suitable for their intended use.

271.   Plaintiff and the other Class members received the Period Underwear in a condition which substantially diminishes their value, and which prevents the underwear from safely and properly being used as intended. As a result of TPC's failure to comply with its statutory obligations, Plaintiffs are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Period Underwear, or the overpayment or diminution in value of their Underwear.

272.   Plaintiff, individually and on behalf of the other Class members, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**Georgia Count 1: Violation of the Georgia Fair Business Practices Act, (Ga. Code Ann. §10-1-390, _et seq._)**

**(On Behalf of Plaintiff Brewer and the Georgia Class)**

273.   Plaintiff Brewer brings this count on behalf of herself and the Georgia Class, and repeats and re-alleges all previous paragraphs, as if fully included herein.

274.   Defendant, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of Ga. Code Ann. §10-1-392(a)(24).

275.   Plaintiff and the Class members are "[c]onsumer[s]" within the meaning of Ga. Code Ann. §10-1-392(a)(6).

276.   Defendant was and is engaged in "[t]rade" and "commerce" within the meaning of Ga. Code Ann. §10-1-392(a)(28).

277.   The Georgia Fair Business Practices Act ("Georgia FBPA") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."  Ga. Code Ann. §10-1-393(a).

- 48 -

CLASS ACTION COMPLAINT

278.  The Georgia FBPA makes unlawful specific acts, including:

a)  "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have" (Ga. Code Ann. §10-1-393(b)(5));

b)  "[r]epresenting that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another" (Ga. Code Ann. §10-1-393(b)(7)); and

c)  "[a]dvertising goods or services with intent not to sell them as advertised" (Ga. Code Ann. §10-1-393(b)(9)).

279.  In the course of its business, Defendant, directly or through its agents, employees, and/or subsidiaries, violated the Georgia FBPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts in its marketing, advertising, and promotions for its TPC Underwear, including that they contained PFAS.

280.  Specifically, by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding TPC Underwear, as detailed above, Defendant engaged in one or more unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Georgia FBPA, including:

a)  representing that the TPC Underwear have characteristics, uses, benefits, and qualities which they do not have;

b)  representing that the TPC Underwear are of a particular standard, quality, and grade when they are not;

c)  advertising the TPC Underwear with the intent not to sell them as advertised; and

d)  engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

281.  Defendant's misrepresentations and omissions regarding the TPC Underwear were disseminated to Plaintiffs and the Class members in a uniform

1  manner.

2  282. Defendant's unfair or deceptive acts or practices, including its

3  misrepresentations, concealments, omissions, and suppressions of material facts, as

4  alleged herein, had a tendency or capacity to mislead and create a false impression in

5  consumers' minds, and were likely to and, in fact, did deceive reasonable consumers,

6  including Plaintiffs and the Class members, about the TPC Underwear.

7  283. The facts regarding TPC Underwear that Defendant knowingly and

8  intentionally misrepresented, omitted, concealed, and failed to disclose would be

9  considered material by a reasonable consumer, and they were, in fact, material to

10  Plaintiffs and the Class members, who consider such facts to be important to their

11  purchase decisions with respect to TPC Underwear.

12  284. Plaintiffs and the Class members reasonably relied on Defendant's

13  misrepresentations, omissions, and concealments with respect to TPC Underwear by

14  purchasing and continuing to purchase TPC Underwear after Defendant's

15  misrepresentations, omissions, and concealments were made.

16  285. Plaintiffs and the Class members were aggrieved by Defendant's

17  violations of the Georgia FBPA because they suffered ascertainable loss and actual

18  damages as a direct and proximate result of Defendant's knowing and intentional

19  misrepresentations, omissions, concealments, and failures to disclose material facts as

20  set forth above.

21  286. Specifically, Plaintiffs and the Class members were deceived by

22  Defendant's misrepresentations, omissions, concealments, and failures to disclose

23  material facts regarding TPC Underwear. Had Defendant not engaged in the deceptive

24  acts and practices alleged herein, Plaintiffs and the Class members would not have

25  purchased the underwear, and, thus, they did not receive the benefit of the bargain

26  and/or suffered out-of-pocket loss.

27  287. Defendant's violations present a continuing risk to Plaintiffs and the Class

28  members, as well as to the general public. Defendant's unlawful acts and practices

1    complained of herein affect the public interest.

2    288.  On November 9, 2023, Plaintiffs sent a notice letter pursuant to Ga. Code

3    Ann. §10-1-399(b) to Defendant.  Upon information and belief, Plaintiffs, however,

4    were excused from providing notice to Ga. Code Ann. §10-1-399(b) to Defendant

5    because TPC does not maintain a place of business and/or does not keep assets within

6    the state of Georgia.

7    289.  As a result of Defendant's violations of the Georgia FBPA, as alleged

8    herein, Plaintiffs and the Class members seek an order enjoining Defendant's unfair or

9    deceptive acts or practices and awarding actual damages, costs, attorneys' fees, and

10   any other just and proper relief available under the Georgia FBPA.

11   **Maine Count 1: Violations of the Maine Unfair Trade Practices Act and**

12   **the Maine Uniform Deceptive Trade Practices Act (ME. REV. STAT. ANN. TIT.**

13   **5 § 205-A, *et seq*. & ME. REV. STAT. ANN. TIT. 10 §§1211-1216)**

14   **(On Behalf of Plaintiff Campbell and the Maine Class)**

15   290.  Plaintiff Campbell brings this count on behalf of herself and the Maine

16   Class, and repeats and re-alleges all previous paragraphs, as if fully included herein.

17   291.  Plaintiffs and the Maine Class are persons who purchased the TPC

18   Underwear primarily for personal, family, or household purposes within the meaning

19   of ME. REV. STAT. ANN. TIT. 5 § 213(1).

20   292.  Maine's Unfair Trade Practices Act (the "Maine UTPA") prohibits "unfair

21   or deceptive acts or practices in the conduct of any trade or commerce."  ME. REV.

22   STAT. ANN. TIT. 5 § 207.

23   293.  The Maine UTPA has historically imposed on manufacturers a duty to

24   accurately advertise and market their products and not misbrand their products in a

25   manner that would deceive consumers.

26   294.  Defendant engaged in unlawful trade practices including, *inter alia*:  (1)

27   representing that its the Products has characteristics, benefits, and qualities that it does

28   not have; (2) representing that its TPC Underwear is of a particular standard and quality

when it is not; (3) advertising the TPC Underwear with an intent not to sell it as advertised; and (4) otherwise engaging in conduct likely to deceive.

295.    Defendant's actions as set forth above occurred in the conduct of trade or commerce within the meaning of ME. REV. STAT. ANN. TIT. 5 § 206(3).

296.    In the course of its business, Defendant advertised and marketed its TPC Underwear as environmentally sustainable, non-toxic, and PFAS-free when in fact the TPC Underwear contained PFAS, and otherwise engaged in activities with a tendency or capacity to deceive.

297.    By failing to disclose and by actively concealing the true quality and characteristics of the TPC Underwear, and by marketing and advertising its TPC Underwear as environmentally and non-toxic, when they were not, Defendant engaged in unfair and deceptive business practices in violation of the Maine UTPA.

298.    Defendant's unfair and deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other members of the Maine Class, about the true quality and characteristics of the TPC Underwear.

299.    Defendant's conduct, as described herein, caused substantial injury to consumers who purchased the TPC Underwear but did not receive the benefit of their bargain because they paid more than they should have for Defendant's products, believing they were purchasing environmentally sustainable and non-toxic underwear when, in fact, they were purchasing underwear with PFAS.

300.    Defendant's misrepresentations as to and concealment of the true quality and characteristics of the TPC Underwear was material to Plaintiffs and the Maine Class.

301.    Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition.  In fact, there are no countervailing benefits to consumers or competition resulting from Defendant's unfair and deceptive acts or practices. Consumers have paid a premium for period underwear that was environmentally sustainable, non-toxic, and PFAS-free that they have not actually received and, because

Defendant is not actually selling PFAS-free period underwear, it can produce higher quantities of the underwear at lower prices than its competitors, thus unfairly distorting the competitive landscape of the menstrual products market.

302.    The unfair and deceptive acts and practices complained of herein were not reasonably avoidable by consumers, because Defendant: a) Possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labeling, selling, and distributing the TPC Underwear throughout the United States that was not TPC Underwear as advertised; b) Intentionally concealed the foregoing from Plaintiffs and the other members of the Maine Class; and/or c) Made incomplete representations about the quality and characteristics of the TPC Underwear generally, while purposefully withholding material facts from Plaintiffs and the other members of the Maine Class that contradicted these representations.

303.    Plaintiffs and the Maine Class suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Maine Class either would have paid less for the TPC Underwear or would not have purchased the TPC Underwear at all.

304.    Defendant's acts and practices, as outlined above, were willful and knowing.

305.    As a direct and proximate result of Defendant's violations of the Maine UTPA, Plaintiffs and the Maine Class have suffered a loss of money and/or property.

306.    Plaintiffs and the Maine Class are entitled to recover restitution by way of full refunds of the purchase price for all their purchases of the TPC Underwear and any other equitable relief, which the Court determines to be necessary and proper pursuant to ME. STAT. ANN. TIT. 5 § 213(1).

307.    Additionally, Defendant has engaged in deceptive trade practices, pursuant to ME. REV. STAT. ANN. TIT. 10, §§ 1212(1), by, among other things, representing that its TPC Underwear have characteristics and ingredients that they do

not have.  Therefore, pursuant to ME. REV. STAT. ANN. tit. 10, § 1213, Plaintiffs and the Maine Class are entitled to equitable relief, including a permanent injunction banning Defendant from marketing and selling the Products as environmentally sustainable, non-toxic, and PFAS-free.

308.  Furthermore, in accordance with ME. STAT. ANN. TIT. 5 § 213(2), Defendant is liable to the Plaintiffs for reasonable attorneys' fees and costs incurred in connection with this action.

**Washington Count 1: Violation of the Washington Consumer Protection Act,**

**(Wash. Rev. Code Ann. §19.86.010, *et seq.*)**

**(On Behalf of Plaintiff Emily Kohring and the Washington Class)**

309.  Plaintiff Kohring brings this count on behalf of herself and the Washington Class, and repeats and re-alleges all previous paragraphs, as if fully included herein.

310.  Defendant, Plaintiff, and the Class members are "[p]erson[s]" within the meaning of Wash. Rev. Code Ann. §19.86.010(1).

311.  The TPC Underwear are "[a]ssets" within the meaning of Wash. Rev. Code Ann. §19.86.010(3).

312.  Defendant was and is engaged in "[t]rade" or "commerce" within the meaning of Wash. Rev. Code Ann. §19.86.010(2).

313.  The Washington Consumer Protection Act ("Washington CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code Ann. §19.86.020.

314.  In the course of its business, Defendant, directly or through its agents, employees, and/or subsidiaries, violated the Washington CPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts in its marketing, advertising, and promotions for its TPC Underwear, including that they contained PFAS.

315.  Specifically, by knowingly and intentionally misrepresenting, omitting,

concealing, and failing to disclose material facts regarding TPC Underwear, as detailed above, Defendant engaged in one or more unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Washington CPA.

316. Defendant's misrepresentations and omissions regarding the TPC Underwear were disseminated to Plaintiff and the Class members in a uniform manner.

317. Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about the presence of PFAS in the TPC Underwear.

318. The facts regarding TPC Underwear that Defendant knowingly and intentionally misrepresented, omitted, concealed, and failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their purchase decisions with respect to TPC Underwear.

319. Plaintiff and the Class members were aggrieved by Defendant's violations of the Washington CPA because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts as set forth above.

320. Specifically, Plaintiff and the Class members were deceived by Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding TPC Underwear. Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and the Class members would not have purchased the TPC Underwear, and, thus, they did not receive the benefit of the bargain and/or suffered out-of-pocket loss.

321. Defendant's violations present a continuing risk to Plaintiff and the Class

members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

322. As a result of Defendant's violations of the Washington CPA, as alleged herein, Plaintiff and the Class members seek an order enjoining Defendant's unfair or deceptive acts or practices and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Washington CPA.

## IX.    REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other members of the proposed Classes, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.    An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Federal Rule of Civil Procedure 23;

B.    An award to Plaintiffs and the other Class members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

C.    An award to Plaintiffs and the other Class members for the return of the purchase prices of the Products with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

D.    A declaration that Defendant must disgorge, for the benefit of Plaintiff and the other Class members, all or part of the ill-gotten profits they received from the sale of the Products, or make full restitution to Plaintiffs and the other Class members;

E.    An award of pre-judgment and post-judgment interest, as provided by law;

F.    An award of attorneys' fees and costs, as allowed by law;

CLASS ACTION COMPLAINT

G.      Leave to amend this Complaint to conform to the evidence produced during discovery and at trial; and

H.      Such other relief as may be appropriate under the circumstances.

**X.      JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated:  November 10, 2023          **LAW OFFICES OF ROBERT G. LOEWY, P.C**

By:  _/s/      Robert G. Loewy_

Robert G. Loewy
*Counsel for Plaintiffs and the Proposed Classes*

CLASS ACTION COMPLAINT